# UNITED STATES AIR FORCE
# COURT OF CRIMINAL APPEALS

————————————

**No. ACM 39003**

————————————

**UNITED STATES**
*Appellee*

**v.**

**Krishil S. PRASAD**
Airman First Class (E-3), U.S. Air Force, *Appellant*

————————————

Appeal from the United States Air Force Trial Judiciary

Decided 5 September 2017

————————————

*Military Judge:* Shelly W. Schools.

*Approved sentence:* Dishonorable discharge, confinement for 30 months, forfeiture of all pay and allowances, and reduction to E-1. Sentence adjudged 9 October 2015 by GCM convened at Grand Forks Air Force Base, North Dakota.

*For Appellant:* Major Johnathan D. Legg, USAF.

*For Appellee:* Major Mary Ellen Payne, USAF; Major Meredith L. Steer, USAF; Gerald R. Bruce, Esquire.

Before MAYBERRY, JOHNSON, and SPERANZA, *Appellate Military Judges.*

Senior Judge MAYBERRY delivered the opinion of the court, in which Judge SPERANZA joined. Senior Judge JOHNSON filed a separate opinion concurring in part and dissenting in part.

————————————

**This is an unpublished opinion and, as such, does not serve as precedent under AFCCA Rule of Practice and Procedure 18.4**

————————————

MAYBERRY, Senior Judge:

A general court-martial composed of officer and enlisted members convicted Appellant, contrary to his pleas, of two specifications of sexual assault and one specification of abusive sexual contact, in violation of Article 120, Uniform Code of Military Justice (UCMJ), 10 U.S.C. § 920. The court sentenced Appellant to a dishonorable discharge, total forfeiture of pay and allowances, confinement for 30 months, and reduction to E-1. The convening authority approved the adjudged sentence.

Appellant asserts three assignments of error: (1) Improper propensity evidence impacted the findings where the military judge erroneously instructed the panel on Military Rule of Evidence (Mil. R. Evid.) 413 in light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016); (2) the evidence is factually insufficient to sustain the convictions; and (3) Appellant should be granted relief for various reasons.[1]

Our superior court's holding in *Hills* compels us to set aside the conviction for one sexual assault conviction and the sentence. Having set aside this conviction, we do not address Appellant's second assignment of error as to this offense. We affirm the findings on the remaining sexual assault and abusive sexual contact convictions.

## I. BACKGROUND

Appellant was charged with offenses involving five different complaining witnesses.

The original charges included one charge with four specifications in violation of Article 120, UCMJ, and one charge with one specification in violation of Article 128, UCMJ, 10 U.S.C. § 928. These allegations involved KF and

---

[1] This issue includes seven separate allegations raised pursuant to *United States v. Grostefon*, 12 M.J. 431 (C.M.A. 1982). The allegations all involve assertions that the military judge erred, specifically by: not disqualifying the legal office because the complaining witness of the Article 128 offense was a paralegal assigned to that office; denying the Defense request to remove a complaining witness's child from the courtroom; not allowing Defense to offer evidence pursuant to Mil. R. Evid. 412; failing to suppress a pretext conversation between Appellant and KF; denying the Defense motion for unreasonable multiplication of charges; denying the motion to dismiss for selective prosecution and violation of equal protection; and failing to conduct an in camera review of mental health records pursuant to Mil. R. Evid. 513 and 514. We reject these issues, which require neither additional analysis nor warrant relief. *See United States v. Matias*, 25 M.J. 356, 361 (C.M.A. 1987).

purportedly occurred in May 2014. These charges were preferred in August 2014; a preliminary hearing was held on 28 October 2014. Three of the Article 120 specifications were referred to a general court-martial on 21 November 2014.

On 8 April 2015, Appellant was charged with Additional Charge I with one specification of attempted abusive sexual contact involving CW in violation of Article 80, UCMJ, 10 U.S.C. § 880; Additional Charge II with two specifications alleging sexual assault (involving KG and CW), and four specifications alleging abusive sexual contact (involving CW, KP(x2) and JH) in violation of Article 120, UCMJ; and Additional Charge III with one specification of assault consummated by a battery involving JH in violation of Article 128, UCMJ. The dates of the alleged offenses ranged from December 2013 to February 2015. A preliminary hearing was held on 13 April 2015. All charges and specifications were referred to the same general court-martial on 30 April 2015, but one specification of abusive sexual contact involving KP was dismissed without prejudice on 1 May 2015.

The convictions involve two of the three specifications involving KF and the sole specification involving KG.[2] The offenses for which Appellant was convicted occurred in May 2014 and February 2015. KF and KG did not know one another.

## A. Allegations involving KF

KF, at the time of the alleged conduct, was an unmarried Airman First Class (A1C) assigned to security forces.[3] Prior to arriving at Grand Forks Air Force Base (AFB), KF had become engaged to Senior Airman (SrA) DF, but SrA DF broke off the engagement because he did not want to be in a long-distance relationship and felt that the relationship was moving "too fast too soon." After some months passed, KF and DF started speaking again and KF very much wanted to get back together.

On 9 May 2014, KF returned to her dorm at approximately 2130 after an evening at the Single Airman Spa Night. She was speaking with another se-

---

[2] Appellant was acquitted of one specification of sexual assault (involving CW), four specifications of abusive sexual contact (involving KF, CW, KP and JH), one specification of attempted abusive sexual contact (involving CW), and one specification of assault consummated by a battery (involving JH), in violation of Articles 120, 80, and 128, UCMJ.

[3] The charge sheet refers to her as A1C KJA based on her military status and maiden name at the time of the offenses. At the time of trial, she was out of the military and married. We will refer to her as KF.

curity forces non-commissioned officer (NCO) on patrol when she saw Appellant enter the dorm. She was friends with Appellant, and she "gave him a hug and said, hi." Shortly thereafter, she went alone with Appellant to his dorm room. The NCO testified that Appellant departed first, and KF followed him shortly thereafter.

KF had been to Appellant's room before on several occasions. That night, they sat together on his bed and began watching television. Appellant tried to tickle KF, and she did not object. Appellant began rubbing KF's feet and legs, again with no objection. While the two were on the bed continuing to watch television, KF started a texting conversation with DF. While she was texting DF, Appellant began rubbing her back and stomach. KF did not object. KF testified that Appellant, who was lying down behind her and "spooning" her, unclasped her bra and started rubbing her breasts. KF testified she did not initially object, but that she pushed Appellant's hands away at some point. Appellant later took her phone from her hands, and she turned over onto her back, at which point Appellant kissed and touched KF's exposed breasts.

KF testified that Appellant then started trying to go into her pants and she tried to push him away and said "no." Appellant put his hand in her pants anyway, and KF told him to "stop or I'm going to hit you." Appellant then penetrated her vagina with his fingers and she slapped his head.

KF testified that after she slapped Appellant, he pulled his hand out, pinned her hands down above her head and Appellant then got on top of her and rubbed his groin against hers, and she felt that Appellant had an erection. While doing this, he returned to kissing her breasts. As Appellant continued to kiss her breasts, she did not say anything to him and just ignored him.[4] KF testified that Appellant tried to kiss her, but that she turned her face away, told him she was not going to kiss him and when she "was still fighting him" Appellant pulled her sweatshirt "over her head and tried to kiss her through the sweatshirt." KF testified that Appellant then stated, "You're not enjoying this, are you," stopped, and went back to lying beside her. Appellant fell asleep and never touched KF again after that point. KF continued to lie next to Appellant for some period of time before getting up. About five minutes later, Appellant woke up and KF asked him for her phone. Appellant took it off the bed and gave it to her, and she left the room, estimating she had been there for about an hour and a half.

---

[4] This was the basis for the abusive sexual contact specification for which Appellant was found not guilty.

On cross-examination, KF admitted that her trial testimony—that she was "fighting off" Appellant and "making it clear to him that" she "didn't want any sexual advances"—was inconsistent with her earlier statements. Specifically, KF admitted she had previously testified at the preliminary hearing that Appellant "stopped when he realized I didn't want to participate." Furthermore, she acknowledged that her trial testimony claiming she told Appellant to stop three or four times was inconsistent with her earlier statements where she had only indicated she told him to stop once. KF conceded her memory was better closer in time to the event, and she could have easily left as the touching escalated, but she did not.

On 20 May 2014, KF reported the incident to a sexual assault response coordinator (SARC) and then to the Air Force Office of Special Investigations (AFOSI). While being interviewed by AFOSI, Appellant contacted KF by text and AFOSI took this opportunity to conduct a pretext conversation, suggesting KF ask Appellant for details about what he did to her and why. The text conversation included the following:

> KF: I'm still upset over what happened the other night. What possessed you to do that, I obviously want [sic] interested.
>
> Appellant: Nothing
>
> KF: What do you mean? Are you not even going to admit that you were in the wrong or say sorry for what you did?
>
> Appellant: I am. Just don't know whats to say.
>
> KF: I thought you were my friend. Then you tried to have sex with me. But I would let you. I told you when you started to play with my boobs I didn't want to. Then you pin[n]ed my hand after I hit you and rubbed yourself against me. And you hid my phone. I only stayed there because I didn't have my phone.
>
> Appellant: Im sorry
>
> KF: So your sorry for that and what that it. You pulled my jacket over my head and tried to kiss me. That just plain weird. I mean seriously. You would you do that. I just need you to say why you did what you did. I thought we were friends. Why would you betray my trust?
>
> . . . .
>
> Appellant: Txt me..coz some of your.messages are coming in blank

KF: Well I don't have your number and I can send it what I said again.

Appellant: I had didn't mean to hurt you or betray your trust

KF: So are you not going to say why you did it? Why you fingered me? Why didn't you stop when I asked you to? If you didn't mean to why did you make it to where I couldn't leave?[5]

Appellant: Talk.to me 2day after work in.person
Hopefully I can explain better
Otherwise I understand what I did was wrong
And im.sorry I hurt you
I was pushing it…..idk
I want to have sex and I wad.trying to get you in the.mood …..im.sorry

KF: By fingering after I said no?

Appellant: Yup
Idk
What to say

KF: I'm glad you said sorry for that. That makes me feel a little better.

Appellant: What do you want me to do to make you feel better

KF: But may I ask why would pinned me down after I hit you upside the head? Help me wrap my head around this.

Appellant: I thought you were being playful. How?

KF: Explain why you still fingered me after I tried you push you away and said no. Please.

Appellant: Can't we talk about this after I get off work. Please

In June 2014, a month after the incident with Appellant, KF got back together with DF. In August 2014, due to reporting the sexual assault, KF was given an expedited transfer to Holloman AFB, New Mexico, where DF was stationed. About a month later, the two were married. DF's testimony was inconsistent as to when he first learned of the alleged sexual assault. At one

---

[5] KF initially believed that Appellant had hidden her phone, when in fact it was in the bed.

point, he said it was around June or July of 2014, and then he stated it was after they were married.

## B. Allegations involving KG

KG was an unmarried Airman (Amn) and Grand Forks AFB was her first duty station. After attending a sexual assault prevention and response (SAPR) briefing in early March 2015, Amn KG reported she had been sexually assaulted in mid-February 2015.

Amn KG grew up in a home of "pretty strict values," where drinking large quantities of alcohol was considered a "sin," and she was homeschooled for most of her high school education. Amn KG met Appellant in December 2014 during her first week at work. Amn KG was friends with Appellant and they hung out together at dorm gatherings.

Amn KG testified that in mid-February 2015, she went to SrA AP's house late in the evening, at his invitation. When she arrived, only SrA AP and Appellant were at the house. Amn KG asked if anyone else was coming over, and they contacted A1C HC and invited him. Amn KG went alone to pick up A1C HC, driving Appellant's car because Appellant was already drunk. Amn KG testified that when she picked up A1C HC, he was also drunk, and he brought a bottle of alcohol back with him to SrA AP's house. Later that night, another coworker, SrA MW, also came over. Amn KG was the only female at the party.

Amn KG testified that SrA AP and Appellant pressured her to drink. Amn KG testified that she had three or four shots and then about three-fourths of a can of beer. Amn KG indicated she was able to walk up and down the stairs and make coherent decisions that night. SrA MW testified that Amn KG did not appear to be drunk. Amn KG testified that Appellant was flirting with her and treated her "really nice." A1C HC testified that on the night in question, he observed Appellant and Amn KG "hugging and kissing, like a couple." SrA MW also stated Amn KG and Appellant were flirting with each other all night, and Amn KG was dancing and having a good time.

In the wee hours of the morning, A1C HC and SrA MW left. Amn KG described Appellant as "falling over the chairs and slurring his words" like "a normal person acts when they are drunk." Appellant went upstairs to sleep in SrA AP's daughter's room. SrA AP took Amn KG downstairs to a living room area and his son's bedroom. Amn KG and SrA AP engaged in mutual "kissing

and touching in the bed" downstairs. At trial, for the first time, Amn KG described these activities as "consensual."[6]

Amn KG and SrA AP discussed Amn KG's sexual inexperience and SrA AP proceeded to explain and demonstrate how Amn KG could experience an orgasm, to include inserting his fingers "inside of" Amn KG. SrA AP stopped any further sexual conduct with Amn KG, in part because she was hesitant and in part because he thought Appellant was interested in Amn KG.

Shortly after they stopped, the two went back up two flights of stairs. Amn KG entered the bedroom where Appellant was and lay down in the bed with him. At trial, Amn KG testified that they too engaged in consensual mutual kissing and [ ] touching." Amn KG took her own clothes off at some point. At trial, Amn KG testified that Appellant then performed oral sex on her, which was consensual. Amn KG testified that after she received oral sex, Appellant "penetrated" her with his penis and "after a little bit . . . he began doing it more forceful because I was moving around. And he kept telling me just to relax, because I was tight he said and that I just needed to relax." Amn KG testified at this point she told Appellant to "stop." Amn KG claimed Appellant did not immediately stop and, instead, pushed her head down with his hand and thrusted himself into her. Amn KG stated that while this was happening, Appellant kept telling her to relax. Amn KG testified she tried to move to the side and Appellant "stopped eventually." Amn KG testified Appellant did not say anything when he stopped and the two of them fell asleep together. Amn KG did not put her clothes back on until the morning.

After both Appellant and Amn KG woke up, Amn KG testified they left SrA AP's house together in Appellant's car. Later that afternoon, Amn KG texted Appellant to request that he drive her back to get her car. Then Amn KG walked to his room and knocked on the door and asked for a ride. Amn KG testified she asked Appellant why he did the things that he did and

---

[6] Amn KG had previously alleged that SrA AP sexually assaulted her based on her beliefs that absent an explicit verbal agreement, there was no consent, and if either party had consumed alcohol, there could be no consent. After making the allegation against SrA AP and testifying at Appellant's preliminary hearing that SrA AP sexually assaulted her, Amn KG indicated she did not want the investigation involving SrA AP to continue. On cross-examination, Amn KG testified that she no longer considered what happened between SrA AP and herself to be an assault because, through her Special Victim's Counsel (SVC), she was able to understand the law and what the law has to say about alcohol and sexual activities. She acknowledged she had an SVC at the time she testified under oath at the preliminary hearing.

she recalled that he said it was "because he was drunk." She did not recall him saying that he did not remember having sex. Amn KG testified that Appellant's answer frustrated her because it was not good enough.

Amn KG's credibility was challenged extensively because of the radical changes in her description of the sexual activity she engaged in with both SrA AP and Appellant. Most importantly, she changed her assessment of what constituted consensual conduct and admitted under oath that her testimony at trial was the first time she had ever indicated the sexual activity with SrA AP was consensual. Further, she either did not recall the specifics of statements she had given before about whether or not she had drunk alcohol before that night but when pressed, she attempted to clarify this by saying that sipping or tasting did not constitute drinking—but then ultimately, she admitted on the stand that her statement that she had not ever drunk alcohol until that night with Appellant was not true. Additionally, Amn KG was cross-examined as to the fact that she told her father that she had been drugged prior to being sexually assaulted, which she indicated must have been a misunderstanding on his part. Furthermore, there was extensive questioning on the issue of whether Amn KG was a virgin in February because she specifically alleged that Appellant had taken her virginity that night. When confronted by AFOSI with evidence that she had sexual intercourse with another Airman with whom she was in a relationship, she indicated that if sex did not cause bleeding, you could still be considered a virgin and her prior sexual intercourse did not cause her to bleed. She alleged that the sexual intercourse with Appellant did cause her to bleed. In fact, she had told investigators that there was significant blood on the sheets and on her underwear. Forensic testing of the sheets showed no blood belonging to Amn KG and she changed her testimony at trial to say that she only said "brown stuff was all over the sheets."

Amn KG conceded that she initially claimed that "the kissing, the touching, the oral sex, and the sex in the bed" between her and Appellant was all "against [her] will." Likewise, she admitted that the first time she ever stated any of the sexual activity between her and Appellant was consensual was when she took the stand at trial. At trial, Amn KG claimed that the kissing, oral sex, and "some of the sex was consensual."

## II. DISCUSSION

### A. Propensity Evidence and Instruction

#### 1. Law

The meaning and scope of Mil. R. Evid. 413 is a question of law that is reviewed de novo. *Hills*, 75 M.J. at 354. Instructional errors are also reviewed de novo. *Id.* at 357.

Mil. R. Evid. 413(a) provides that in a court-martial where the accused is charged with a sexual offense, evidence that the accused committed other sexual assaults may be admitted and considered on "any matter to which it is relevant." This includes using evidence of sexual assaults to prove the accused has a propensity to commit sexual assault. *United States v. James*, 63 M.J. 217, 220 (C.A.A.F. 2006).

In *Hills*, the United States Court of Appeals of the Armed Forces (CAAF) held that evidence of the accused's commission of a sexual assault may *not* be used to prove propensity if the alleged sexual assault is charged in the same court-martial and the accused has pleaded not guilty to it. 75 M.J. at 356. The CAAF further held that the instructions accompanying the admission of evidence of charged offenses for Mil. R. Evid. 413 purposes "violated Appellant's presumption of innocence and right to have all findings made clearly beyond a reasonable doubt, resulting in constitutional error." *Id.* Because "there are constitutional dimensions at play," prejudice for such an error must be tested for harmlessness beyond a reasonable doubt. *Id.* at 357 (quoting *United States v. Wolford*, 62 M.J. 418, 420 (C.A.A.F. 2006)). "An error is not harmless beyond a reasonable doubt when 'there is a reasonable possibility that the [error] complained of might have contributed to the conviction.'" *Id.* at 357–58 (quoting *United States v. Moran*, 65 M.J. 178, 187 (C.A.A.F. 2007)). "To say that an error did not contribute to the verdict is, rather, to find that error unimportant in relation to everything else the jury considered on the issue in question, as revealed in the record." *Id.* at 358 (quoting *Yates v. Evatt*, 500 U.S. 391, 403 (1991), *overruled on other grounds by Estelle v. McGuire*, 502 U.S. 62, 72 n.4 (1991)).

In *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017), the CAAF clarified that *Hills* is not to be interpreted narrowly:

> [T]he use of evidence of charged conduct as M.R.E. 413 propensity evidence for other charged conduct in the same case is error, regardless of the forum, the number of victims, or whether the events are connected. Whether considered by members or a military judge, evidence of a charged and contested offense, of which an accused is presumed innocent, cannot be used as propensity evidence in support of a companion charged offense.

*Id.* at 222. The CAAF reiterated that, where such error exists, the Government must "prove there was no reasonable possibility that the error contributed to [the] verdict." *Id.*

**2. Analysis**

The Government concedes that, in light of *Hills* and *Hukill*, the military judge erred in permitting evidence of the charged sexual offenses to be used pursuant to Mil. R. Evid. 413 and instructing the court members accordingly. We agree. Although the military judge's ruling is understandable coming as it did before the decision in *Hills*, we must "apply the clear law at the time of appeal, not the time of trial." *United States v. Mullins*, 69 M.J. 113, 116 (C.A.A.F. 2010) (citing *United States v. Harcrow*, 66 M.J. 154, 159 (C.A.A.F. 2008)); *see also Johnson v. United States*, 520 U.S. 461, 469 (1997).

The military judge instructed the members as follows concerning the use of evidence:

> An accused may be convicted based only on evidence before the court and not on evidence of a general criminal disposition. Each offense must stand on its own and you must keep the evidence of each offense separate. Stated differently, if you find or believe that the accused is guilty of one offense, you may not use that finding or belief as a basis for inferring, assuming, or proving that he committed any other offense.

> If evidence has been presented which is relevant to more than one offense, you may consider that evidence with respect to each offense to which it is relevant. For example, if a person were charged with stealing a knife and later using that knife to commit another offense, evidence concerning the knife, such as that person being in possession of it or that person's fingerprints being found on it, could be considered with regard to both offenses. But the fact that a person's guilt of stealing the knife may have been proven is not evidence that the person is also guilty of any other offense.

> Further, evidence that the accused committed any sexual offense alleged in the Charge, Additional Charge I, and Additional Charge II may have no bearing on your deliberations in relation to each other unless you first determine by a preponderance of the evidence that is more likely than not an offense alleged in one or more of the specifications under those charges occurred. This evidence has no bearing on Additional Charge III and its Specification.

> If you determine by a preponderance of the evidence any offense alleged in the Charge, Additional Charge I or Additional Charge II occurred, even if you are not convinced beyond a reasonable doubt that the accused is guilty of that offense, you may nonetheless then consider the evidence of that offense for its bearing on any matter to which it is relevant in relation to the remaining offenses under the Charge, Additional Charge I and Additional Charge II. You may also consider the evidence of such other sexual offense for its tendency, if any, to show the accused's propensity or predisposition to engage in sexual offenses.

> You may not, however, convict the accused of any offense solely because you believe the accused has a propensity or predisposition to engage in sexual offenses. In other words, you cannot use this evidence to overcome a failure of proof in the government's case, if you perceive any to exist. The accused may be convicted of an alleged offense only if the prosecution has proven each element of that offense beyond a reasonable doubt.

> You are further advised: First, that the accused is presumed to be innocent until the accused's guilt is established by legal and competent evidence beyond a reasonable doubt. (2) Second, if there is reasonable doubt as to the guilt of the accused, that doubt must be resolved in favor of the accused, and he must be acquitted. And lastly, the burden of proof to establish the guilt of the accused beyond a reasonable doubt is on the government. The burden never shifts to the accused to establish innocence or to disprove the facts necessary to establish each element of each offense.

Additionally, the trial counsel in this case argued the use of propensity evidence in his closing argument. Senior trial counsel's argument went on for almost 90 minutes, contained numerous references to the use of propensity evidence, and explicitly referred to the very burden of proof language addressed in *Hills*:

> And this is where we tie in, we start to tie in the propensity evidence . . . that's the lens through which you have to view this entire court. He has a propensity not to stop when someone says no. Five women told him no, and he kept going.

> . . . .

> The law realizes that people who engage in sexual offenses may have a propensity to commit that crime again and again and again what is what happened here.
>
> . . . .
>
> [T]hat propensity evidence, what do we see here again and again? And if you find by a preponderance of the evidence, okay, which is more likely than not, in fact even if it's not beyond a reasonable doubt, if you find it more likely than not that he did this, then you can use that when you are looking at other crimes in this case.
>
> . . . .
>
> [A]nd you can use that to determine that he has a propensity to do this type of stuff.

Nevertheless, the Government contends the error in Appellant's case is harmless beyond a reasonable doubt. We agree as to the specification of sexual assault and abusive sexual contact involving KF, but not the sexual assault involving Amn KG.

### a. Strength of the Evidence of findings of not guilty

The Government argues the fact that the court members acquitted Appellant of seven of the ten specifications indicates that the panel did not improperly use the evidence because if the members had improperly used propensity evidence that was not established beyond a reasonable doubt, they would have convicted Appellant of all specifications. To some, this position may be disregarded as being based on sheer speculation regarding the panel's thought process. While it is impossible to identify the rationale for the members' findings based solely on the results themselves, a closer examination of the record allows us to resolve whether or not the error involving the use of propensity evidence contributed to all aspects of the verdict, not just the convictions. Such a review, by definition, requires analysis of each specification.

All six allegations resulting in not guilty findings for which propensity was allowed[7] were weak. Five of them involved offenses from three of the four "additional" complaining witnesses. All of these witnesses were reluctant participants for differing reasons. The day before the first preliminary hearing, the Government representative requested that the preliminary hearing of-

---

[7] This does not include the assault consummated by a battery charge involving JH as it is did not allege sexual conduct.

ficer also investigate a newly revealed allegation by Airman First Class (A1C) JH, a paralegal from the base legal office. The paralegal had been interviewed by AFOSI some five months earlier as part of their investigation of KF's allegations, described an event that took place on 31 December 2013, but denied Appellant had ever done anything to her. She provided a sworn statement recounting the event that described Appellant as "flirty and loveable" and a close friend. The night before the preliminary hearing, Appellant's defense counsel interviewed A1C JH and requested she be made available as a potential Defense witness. After the Defense interview, A1C JH was interviewed by the Government representatives. She was read her rights for underage drinking and after consulting with a defense counsel, resumed the interview. She then alleged that on 31 December 2013, both she and Appellant had been drinking, both of them were on his bed, Appellant kissed her repeatedly and touched her without her consent. In addition to the fact that A1C JH did not report the assault but rather had affirmatively denied any inappropriate conduct, when A1C JH left Appellant's room, another Airman went with her, and the two of them engaged in consensual kissing. That activity only stopped when A1C JH's boyfriend texted that he was back and on his way up to her room. In addition, an eyewitness testified that he observed A1C JH and Appellant kissing in Appellant's room that night, and described it as mutual.

The remaining offenses for which Appellant was acquitted involved two women who had been involved in some level of relationship with Appellant.

KP was a civilian who had led a very sheltered life. She worked and went to school on base and routinely went to Appellant's dorm room when he was not there between classes or after class before going to work. Although their relationship was unknown to her family, it was not a secret. In fact, she testified she and Appellant planned to marry. When her parents learned of the relationship, and its sexual component, they made her quit her job, took her phone and iPad, essentially restricted her to their home (she was 20 years old), and sent their pastor to inform Appellant the relationship was over. Nevertheless, she reinitiated contact with Appellant a few months later, secretively met him at a local park, and testified that at that time they engaged in mutual kissing. She never reported any inappropriate touching by Appellant until she was contacted by AFOSI, and only agreed to participate when the legal office told her some of the charges Appellant was facing were alleged to have happened during their relationship and that her testimony would help their case.

CW was another non-military-affiliated civilian who met Appellant on an online dating website in October 2014. Twice she invited him to her apartment, and on both occasions they engaged in sexual activity. She indicated

that she did not consent to all of the sexual activity. Despite asking Appellant to leave her apartment the second night after being reluctant to *continue* to engage in sexual behavior with Appellant, she texted him a few days later to ask if their relationship was going to "go any further." Appellant never responded to this text. She did not report anything until an Airman she worked with, who knew she had gone out with Appellant, told her about the charges Appellant was facing. She went to AFOSI but told them she "didn't believe she was a victim and did not want to participate" in part because she did not think Appellant would recognize her. After Appellant and a large group of his friends showed up at the arcade where she worked, and Appellant said "hi" to her, she changed her mind. She agreed to help because AFOSI said it would be helpful for them if she testified as to what happened.

Only the allegation that Appellant committed abusive sexual contact of KF by kissing directly her breast without consent involves a complaining witness where there were mixed findings. As previously stated, KF was named in the original charges and had made a timely report to law enforcement. Nevertheless, like the specifications discussed above, the evidence of this allegation was weak. The evidence available to the factfinders was that after allowing Appellant to rub her back and breasts, KF turned over onto her back when Appellant took her phone out of her hand and never voiced an objection to Appellant's actions until his hand wandered from her breasts to her waist and below. The military judge gave a general mistake of fact instruction which stated:

> The evidence has raised the issue of mistake of fact as to consent in relation to the offenses of sexual assault by causing bodily harm, abusive sexual contact by causing bodily harm, and attempted abusive sexual contact by causing bodily harm as alleged in Specifications 1, 2, and 3 of the Charge, the Specification of Additional Charge I, and Specifications 1, 2, 3, and 4 of Additional Charge II. There has been testimony tending to show that, at the time of the alleged offenses, the accused mistakenly believed that the named victims consented to the sexual conduct alleged in each of these specifications.

> Mistake of fact as to consent is a defense to these charged offenses. "Mistake of fact as to consent" means the accused held, as a result of mistake, an incorrect belief that the other person consented to the sexual conduct alleged. The mistake must have existed in the mind of the accused and must have been reasonable under all the circumstances. To be reasonable, the mistake must have been based on information, or lack of it, that would indicate to a reasonable person that the other per-

son consented. Additionally, the mistake cannot be based on the negligent failure to discover the true facts. "Negligence" is the absence of due care. "Due care" is what a reasonably careful person would do under the same or similar circumstances.

Additionally, the military judge gave a tailored instruction informing the members they may consider the evidence that KF hugged Appellant, accompanied him to his room, lay in his bed, and allowed him to massage her body as evidence of whether she consented to the charged sexual acts or whether Appellant had a reasonable mistake of fact as to consent.[8]

The evidence surrounding this allegation was primarily from KF's testimony, and there is no mention of this conduct in the pretext text conversation with Appellant. It is not at all unreasonable to conclude that the members believed KF either consented to this conduct, or that Appellant mistakenly believed that KF consented.

Despite the erroneous instruction regarding the use of propensity evidence, the reliance by the prosecution on the fact that there were five women who came forward, and the trial counsel's argument appealing to the members to look at the entire case through a "propensity lens," the members in this case found Appellant not guilty of six sexual conduct specifications involving four women. Thus we are persuaded the members declined trial counsel's invitation to "view this entire court" through a propensity lens that undermined Appellant's presumption of innocence.

That leaves us with the three specifications of which Appellant was convicted involving KF and Amn KG. The evidence the members could consider included the direct evidence of each of these specifications, as well as the potential propensity evidence from not only these specifications themselves but also from the six specifications resulting in not guilty findings. This is a very different fact pattern than was presented in Hills, but involves the same legal principle, and one which is addressed in cases not involving propensity instructions. As our superior court stated in *Moran*, to say that an error did not contribute to the ensuing verdict is not to say that the members were "totally

---

[8] Similarly, the military judge instructed the members they may consider that CW engaged in consensual sexual contact with Appellant; KP engaged in past acts of consensual sexual activity with Appellant; A1C JH may have flirted with Appellant immediately preceding the charged offenses and may have kissed him; and that Amn KG may have flirted with Appellant and engaged in consensual sexual activity with him as evidence of whether each consented to the charged sexual acts or whether Appellant had a reasonable mistake of fact as to consent.

unaware" of that feature of the trial later held to have been erroneous. 65 M.J. at 187. In *Moran*, the CAAF held that they were "convinced that independent evidence of [Appellant's] guilt was overwhelming," a conclusion that renders any error, assumed or otherwise, harmless beyond a reasonable doubt. *Id*. at 188.

### b. Strength of the Evidence of Convictions involving KF

The independent evidence regarding the sexual assault and abusive sexual contact convictions involving KF included the testimony of KF that when Appellant started trying to go into her pants, she tried to push him away and said "no." When Appellant put his hand in her pants anyway, she told him to "stop or I'm going to hit you," and when Appellant then penetrated her vagina with his fingers she slapped his head. Shortly after being slapped, Appellant removed his hands from her vagina and her pants. While the sexual assault may have ended, after kissing KF's breasts for some period of time, Appellant then proceeded to rub his noticeably erect penis on KF's groin, and only after doing so, uttered the words "you're not enjoying this, are you," and stopped.

In addition to KF's testimony, the text conversation between KF and Appellant is compelling evidence. Appellant confirms that he digitally penetrated KF and does not deny rubbing his penis on her groin over her clothes after she said "no" and hit him. When asked to explain why he did so, his response is that "he wanted to have sex," he "was pushing it," and he was "trying to get her in the mood," and when KF challenged this explanation with "by fingering me after I said no" Appellant responded "yup." He acknowledged that "what [he] did was wrong," apologized and "did not know what [else] to say."

The members also had the opportunity to consider the evidence derived from defense counsel's cross-examination of KF. That cross-examination focused on establishing that KF had a motive to fabricate the allegations to get back together with her fiancé, and establishing that KF's behavior of consensually hugging Appellant, willingly coming to his room, and willingly lying in his bed and allowing him to massage her body, should be considered as evidence of consent or mistake of fact as to consent. The testimony elicited on cross-examination resulted in the military judge giving mistake of fact and motive to fabricate instructions.

Additionally, the members acquitted Appellant of the abusive sexual contact involving his kissing of KF's breasts. This could have been based on a finding that KF consented, that Appellant mistakenly believed she consented, or that the members disbelieved that portion of her testimony, which is perfectly acceptable under the law. *See United States v. Harris*, 8 M.J. 52, 59

(C.M.A. 1979) (a factfinder "may believe one part of a witness' testimony and disbelieve another").

We are convinced that the members had overwhelming evidence as to each element of sexual assault and abusive sexual contact of KF beyond a reasonable doubt. Furthermore, we are convinced that there is no reasonable possibility that the military judge's instructions concerning propensity evidence and the members' consideration, if any, of the charged offenses as propensity evidence contributed to their findings that Appellant sexually assaulted KF by penetrating KF's vulva with his finger without her consent and committed abusive sexual contact by touching her groin through her clothing with his penis without her consent. Accordingly, we find the error to be harmless beyond a reasonable doubt with respect to the offenses against KF.

### c. Strength of the Evidence of Convictions involving KG

The Government's evidence regarding Amn KG's allegations, on the other hand, was vulnerable for a variety of reasons. Unlike KF, the case regarding KG hinged on her credibility and was not corroborated by a very damning admission. Her credibility, furthermore, was substantially attacked. Accordingly, we are not convinced that the error was harmless beyond a reasonable doubt. Thus, we cannot sustain the conviction of Specification 1 of Additional Charge II.

## B. Factual Sufficiency of Sexual Assault and Abusive Sexual Contact Convictions

This court reviews issues of factual sufficiency de novo. *United States v. Washington*, 57 M.J. 394, 399 (C.A.A.F. 2002). The test for factual sufficiency is "whether, after weighing the evidence in the record of trial and making allowances for not having personally observed the witnesses, [we are] convinced of [Appellant]'s guilt beyond a reasonable doubt." *United States v. Reed*, 54 M.J. 37, 41 (C.A.A.F. 2000); *United States v. Turner*, 25 M.J. 324, 325 (C.A.A.F. 1987). In conducting this unique appellate role, we take "a fresh, impartial look at the evidence," applying "neither a presumption of innocence nor a presumption of guilt" to "make [our] own independent determination as to whether the evidence constitutes proof of each required element beyond a reasonable doubt." *Washington*, 57 M.J. at 399.

To sustain a conviction for sexual assault as charged in Specification 1 of Charge I, the Prosecution was required to prove: (1) that Appellant committed a sexual act upon KF, to wit: penetrating her vulva with his finger with an intent to gratify the sexual desires of Appellant; (2) that Appellant did so by causing bodily harm to KF, to wit: penetrating her vulva with his finger;

and (3) that Appellant did so without KF's consent. Article 120, UCMJ, 10 U.S.C. § 920 (2012).

To sustain a conviction for abusive sexual contact as charged in Specification 3 of Charge I, the Prosecution was required to prove: (1) that Appellant committed sexual contact upon KF, to wit: touching her groin through the clothing with his penis with an intent to gratify the sexual desires of Appellant; (2) that Appellant did so by causing bodily harm to KF, to wit: touching her groin through the clothing with his penis; and (3) that Appellant did so without the consent of KF. Article 120, UCMJ, 10 U.S.C. § 920 (2012).

The evidence presented at trial, discussed extensively above, satisfy all of the elements of these charged offenses. Having reviewed the entire record of trial and making allowances for not personally observing the witnesses, we are ourselves convinced of Appellant's guilt beyond a reasonable doubt.

### III. CONCLUSION

The findings of guilt as to Specifications 1 and 3 of Charge I are **AFFIRMED**. The finding of guilt as to Specification 1 of Additional Charge II and the sentence are **SET ASIDE**. A rehearing as to the set-aside finding and as to the sentence is authorized. The record is returned to the Judge Advocate General for remand to the convening authority for action in accordance with this opinion.

JOHNSON, Senior Judge (concurring in part and dissenting in part):

I concur with my colleagues in their conclusion that the finding of guilt as to Specification 1 of Additional Charge II with respect to KG must be set aside in light of *United States v. Hills*, 75 M.J. 350 (C.A.A.F. 2016) and *United States v. Hukill*, 76 M.J. 219 (C.A.A.F. 2017). However, I cannot agree that the erroneous instructions and use of evidence of charged offenses for propensity with respect to Specifications 1 and 3 of Charge I involving KF was harmless beyond a reasonable doubt, and therefore I respectfully dissent.

Under our superior court's holdings in *Hills* and *Hukill*, an error of constitutional dimensions occurred in Appellant's trial—one that compromised Appellant's presumption of innocence. *See Hills*, 75 M.J. at 357. Therefore, we must set aside the findings unless we find the error is harmless beyond a reasonable doubt. *Id*. In other words, if there is any "reasonable possibility that the [error] complained of might have contributed to the conviction," we are compelled to set aside that finding of guilt. *Id*. (citations and internal quotation marks omitted). The question is not whether this court is satisfied that, absent the evidence of propensity to commit sexual assault, the evidence es-

tablishes Appellant's guilt beyond a reasonable doubt. Rather, the question is whether there is a reasonable possibility the improper propensity evidence and erroneous instructions contributed to the court members' findings of guilty.

I believe there is such a possibility. KF was sober and voluntarily followed Appellant into his dorm room. As KF rested on Appellant's bed, she permitted him to progress from rubbing her back and stomach, to unclasping her bra, to exposing, fondling and kissing her breasts, without objecting or attempting to leave. KF admitted that she had previously testified she believed Appellant thought she was joking when she told him to stop, and that she previously testified Appellant stopped when he realized she did not want to participate. The military judge found the evidence raised the issue of reasonable mistake of fact as to all of the charged offenses against KF and instructed the court members accordingly. That the court members acquitted Appellant of one of the charged offenses against KF suggests they did, in fact, have concerns regarding the extent to which she consented, or Appellant reasonably believed she consented, to his actions. Appellant's conciliatory text exchange with KF, although useful evidence for the Prosecution, did not necessarily extinguish all reasonable doubts the members may have harbored that Appellant, at the time, believed KF was consenting to his advances.

In argument, trial counsel emphasized the number of alleged victims in the case, and repeatedly invited the court members to consider and use evidence of the charged offenses as evidence of Appellant's propensity to commit sexual offenses. Unlike the majority, I am not persuaded that Appellant's acquittal of six specifications of sexual offenses against four alleged victims, including KF, demonstrates the court members did not improperly use the propensity evidence and instructions. I believe it is reasonably possible the members followed the Government's advice and applied the military judge's erroneous instructions to use propensity evidence from at least some of the charged offenses to overcome doubts regarding Appellant's guilt. Accordingly, under *Hills* and *Hukill*, Appellant is entitled to a new trial, and I would set aside and authorize a rehearing on all of the findings of guilty.

FOR THE COURT

KURT J. BRUBAKER
Clerk of the Court